Between EBENEZER S. WILLIAMS, administrator of Sarah Williams, deceased, appellant, and DANIEL CARLE, administrator of Ann Carle, deceased; DANIEL C. WILLIAMS, THEODORE WILLIAMS, and SARAH ANN WILLIAMS, respondents.

If a woman, during the course of a treaty of marriage with her, makes, without notice to the intended husband, a conveyance of any part of her property, though good *prima facie*, it may be set aside because affected with that fraud.

In the case of actual fraud, a court of equity will not refuse relief on account of lapse of time where the bill was filed with great promptness after the supposed discovery of the alleged fraud was made.

If a woman, on the eve of her marriage, rightfully placed a part of her estate in her sister's hands, in trust for the children of her intended marriage, and there were no children of the marriage, the fund belongs to the husband on the death of the wife.

Where there were children, who, as *cestui qae trusts*, disclaimed title, and renounced all right to the fund, and declined to accept it, the fund belongs to the husband, as administrator.

The filing of a cross bill does not, as a matter of course, stay the proceedings. in the original suit.

If the party filing the cross-bill wishes to stay the cause upon the originial pleadings, he should give notice, and apply to the court for an order to that effect.

Where the cross-bill was not filed until a year after the filing of the original bill. and after the proofs had been taken, and the original cause noticed for

o

hearing, and a proper decree could be made without the necessity of a cross-bill, the Chancellor would not delay the hearing on the original bill on the ground that the plaintiffs had not answered the cross-bill. By WILLIAMSON, Chancellor.

Where a cross-bill was filed by two of the defendants, who had put in their answers disclaiming any interest in the original suit, and the cross-bill alleged that the answers were filed through mistake, &c., the pleadings were incongruous and irregular: the proper course is to apply for leave to withdraw their answers. By WILLIAMSON, Chancellor.

This cause was heard at May term, 1855, of the Court of Chancery.

Sarah Williams, the wife of the complainant, died in the year 1834. The complainant took out letters of administration upon her estate. He exhibited this bill against Daniel Carle, as the administrator of Ann Carle, who was the sister of Mrs. Williams, and against his three children by his said wife. The bill alleges, that while the complainant was in treaty of marriage, his intended wife, Sarah, without his knowledge or consent, in contemplation of her expected marriage, placed seven hundred dollars in the hands of Ann Carle, her sister, in trust for any children she might have by her marriage; that Ann Carle died in the year 1852, having this money in her possession, with a large amount of accumulated interest; that the complainant did not make the discovery of this *fraud* upon his marital rights until after the death of Ann Carle, it was revealed and made known by her administrator. The prayer of the bill is, that he may be declared entitled to seven hundred dollars and interest, and that Daniel Carle, as the personal representative of the trustee, may be decreed to pay it to him.

*Jacob Vannatta* and *E. W. Whelpley,* for the complainant, cited *Newland on Con.* 424; *Howard* v. *Hooper,* 2, *Chan.* 42; *Taylor* v. *Pugh,* 1 *Hare* 608; *Goddard* v. *Snow,* 1 *Russ.* 485; *White's Lead. Ca. in Eq.* 313; *Bal* v. *Montgomery,* 2 *Ves. Jr.* 193; *Carlton* v. *Earl of Dorset,* 2 *Vern.* 17; *Stratchmore* v. *Bowes,* 1 *Ves. Jr.* 22; 9 *B. Monroe;* 5 *Ire-*

*Jell* 163 ; 6 *Ib.* 546 ; 1 *Roper, H. & W.* 163 ; *Hill on Trustees* 162.

*Jos. Annin* and *J. W. Miller*, for defendants, cited *Clancy* 455 ; *Blight's case, Freeman's Rep.* 92 ; *Hunt* v. *Matthews*, 1 *Vern.* 408 ; *King* v. *Cotton*, 1 *P. W.* 674 ; 2 *Ves.* 264 ; 2 *Coxe* 28 ; *Newland's Eq.* 429 ; *Story* § 273 ; 1 *Ves. & Beam* 354 ; 1 *Dess.* 26.

At the term of October, 1855, a final decree was made in the Court of Chancery, by his Honor Benjamin Williamson, whereby it was adjudged that the complainant was not entitled to the relief sought and urged for by him, and that his bill should be dismissed with costs. From this decree an appeal was taken.

The Chancellor furnished the court with the following opinion, as containing the reasons for his decree.

WILLIAMSON, C. The defendants' counsel when this cause was moved for final hearing, raised a preliminary question upon the pleadings. They objected to the hearing of the cause, on the ground that the complainant had not answered the *cross-bill* filed by two of the defendants, and insisted that the original cause could not be heard until the case made by the cross-bill was ready for a final hearing.

The filing of a cross-bill does not, as a matter of course, stay the proceedings in the original suit. If the party filing the cross-bill wishes to stay the cause upon the original pleadings, he should give notice, and apply to the court for an order to that effect. We have no rule of the court regulating the proceedings; and the only statute upon the subject is that which declares, that " if a cross-bill be exhibited, the defendant to the first bill shall answer thereto before the defendant to the cross-bill shall be compelled to answer such cross-bill." In all other respects, the proceedings are governed by the English practice. This practice will be found correctly stated in

2 z*

the case of *White* v. *Buloid*, 2 *Paige* 164. If the proceedings in the original suit are stayed until both causes are ready for hearing, then the complainant in the cross-suit may have an order that both causes may be heard at the same time. This mode of proceeding is necessary, in order to prevent the original complainant from being unnecessarily delayed in his cause. In the present case, the original bill was filed in May, 1854. The cross-bill was not filed until May, 1855, after the proofs had been taken, and the original cause noticed for hearing. It is true, upon the hearing of a cause, the court will in some instances, of its own motion, order a cross-bill to be filed, as where such pleadings are indispensible in order that a proper decree may be made to settle the matter in controversy. In such case, the original suit must of necessity be delayed. I do not, however, see any necessity for a cross-bill for any such purpose here. If the complainant can sustain the case made by his bill, he is entitled to a decree against the defendants ; and none of the defendants, if the complainant succeeds, are entitled to any collateral relief. If the complainant fails, with the view I take of the case, the defendants are entitled to no relief upon the trust set up by them in their cross-bill.

There is another objection to this cross-bill. It was irregularly exhibited. It is filed by two of the defendants, who had put in their answers disclaiming any interest in the original suit. They now come with their cross-bill, alleging that they filed their answers improvidently and through mistake, and under a misapprehension of their rights. Their proper course was to have applied to the court for leave to withdraw their answers. The court might have granted leave upon such terms as, under the circumstances, it might have been proper to impose. The pleadings are now irregular and incongruous. By one pleading they deny a trust, and disclaim any interest in it, by another, they set up the trust, and ask that it may be established.

I shall proceed to examine the case, as it is presented by the pleadings and proofs in the original cause.

The complainant is the administrator of his deceased wife, and the case made by his bill is this: that he was in expectation of a considerable fortune upon the death of his father; that Sarah Carle was entitled to a large property from the estate of her deceased father, and also from that of a deceased brother; that these expectations made a marriage between himself and Sarah Carle a suitable one, and with other considerations, induced him to propose their connection by marriage; that after their engagement and agreement to marry, Sarah Carle, without his consent or knowledge, and to *deprive him of the benefit of her property, and in fraud of his marital rights,* placed in the hands of her sister, Ann Carle, the sum of seven hundred dollars, for the use and benefit of any children the said Sarah might have; that the marriage was consummated in 1819; that they had three children, who are all of age and now living; that his wife died in 1834; that Ann Carle, the alleged trustee, died in 1852, and her estate was administered upon by one of the defendants, Daniel Carle; that in December, 1853, the complainant for the first time discovered, through the admission of Daniel Carle, the disposition of the seven hundred dollars. The complainant prays that Daniel Carle, the administrator of the trustee, Ann Carle, may be decreed to pay him the seven hundred dollars, with the interest that has accumulated.

The three children of the complainant, with Daniel Carle, the administrator of Ann, are the defendants in the suit. The three children filed their disclaimers. Daniel Carle, by his answer, admits all the facts charged in the bill, except that of any sum of money having been placed by Sarah Carle in the hands of her sister Ann for any such purpose as that mentioned in the bill. Of this he denies all knowledge, information, or belief.

The defendants, in resisting the complainant's claim,

object to his maintaining this suit, on account of the length of time which has intervened between the period when the alleged fraud is said to have been committed and the filing of the present bill. There is no objection on account of the lapse of time. The bill charges actual fraud; and as was said in *Michoud et al.* v. *Girod et al.* (4 *Howard* 561), "in the case of actual fraud, no case can be found in which a court of equity has refused to give relief within the lifetime of either of the parties upon whom the fraud is proved, or within thirty years after it has been discovered or become known to the party whose rights are affected by it." The present bill was filed with great promptness after the supposed discovery of the alleged fraud was made. The first intimation the complainant had of any fraud was in December, 1854, and in less than six months after, this suit was instituted.

Nor is there any doubt as to the law's affording the complainant ample redress under the circumstances, if the fact is established that Sarah Carle placed the money in the hands of her sister Ann at the time and *for the purpose* alleged. The rule is laid down by *Lord Thurlow*, in the case of the *Countess of Stratchmore* v. *Bowes* (1 *Ves. Jr.* 22). "A conveyance made by a wife, whatsoever may be the circumstances, and even the moment before the marriage, is *prima facie* good, and becomes bad only upon the imputation of fraud. If a woman, during the course of a treaty of marriage with her, makes, without notice to the intended husband, a conveyance of any part of her property, I shall set it aside, though good *prima facie*, because affected with that fraud." There is some conflict of authorities as to whether the mere fact of concealment, alone, on the part of the woman is sufficient to constitute a fraud upon the intended husband's marital rights; and whether, in addition to the concealment, it must not be shown that the intended husband *knew* the woman to be possessed of the property which she disposed of. The English and American cases will be found collected in

the notes to the case of *Stratchmore* v. *Bowes* (1 *Leading Cases in Eq.*, *Hare & Wallace's notes*, 338). In the case of *Goddard* v. *Snow* (1 *Russ.* § 485), a woman ten months before her marriage, but after the commencement of that intimate acquaintance with her future husband which ended in marriage, made a settlement of a sum of money, which he did not know her to be possessed of ; the marriage ceremony took place, she concealing from him both her right to the money and the existence of the settlement : ten years afterwards she died ; and after her death he filed a bill to have the money paid him. It was held that the settlement was void, as being a fraud on his marital rights. Although some dissatisfaction has been expressed with this case, and it was said by *Lord Brougham*, in *St. George* v. *Wake* (1 *Myl. & K.* 622), that the principle was carried further in *Goddard* v. *Snow* than in any other case, I think the case was decided upon the right principle. In *Taylor* v *Pugh* (1 *Hare* 608), it was argued by the defendant's counsel, that as the defendant was ignorant of his wife's having any property, and as she had practised no actual deception upon him, a court of equity ought not to interfere ; but the *Vice Chancellor* declared the argument unsound, and approved the rule, as stated by *Roper*, that "deception will be inferred if, after the commencement of the treaty for marriage, the wife should attempt to make any disposition of her property without her intended husband's knowledge or concurrence." In *England* v. *Downs* (2 *Beav.* 524), the *master of the rolls* says, "The non-acquisition of property, of which (the husband) had no notice, is no disappointment, but still his legal right to property actually existing is defeated, and the vesting and continuance of a separate power in his wife over property which ought to have been his, and which is without his consent made independent of his control, is a surprise upon him, and might, if previously known, have induced him to abstain from the marriage."

The present case is free from all difficulty in respect to

these rules, about which there appears some difference in the minds of learned judges. It is admitted that the complainant knew that his wife was entitled to a portion of her deceased father's and brother's estate, and that during the treaty of marriage, he expected that upon its consummation he would, as her husband, be entitled to this property. It is perfectly clear that if any of this property was disposed of without his consent *during the treaty of marriage* his just expectations were disappointed, and that he was fraudulently deprived of his marital rights.

The counsel of the defendants further insisted, that the disposition which is alleged to have been made of the property, being for the benefit of the children of the proposed marriage, the trust was a meritorious one, and such as a court of equity will not disturb. The cases of *Hunt* v. *Matthews* (1 *Vern.* 408), and of *King* v. *Cotton* (2 *P. W.* 674), were cited as sustaining the rule, that a settlement by a widow upon her children by a former marriage, even if made during the treaty for a second marriage without the consent or knowledge of her intended husband, is valid. It was argued that a settlement for the benefit of children of the contemplated marriage is equally meritorious. But I cannot understand upon what just principle a trust in either case can be declared valid by a court of equity. In *Hunt* v. *Matthews*, the court is reported to have said, or rather *thought*, for that is the word used, that a widow might with a good conscience, before she put herself under the power of a second husband, provide for the children she had by the first. Now there may be no difference of opinion as to the *propriety* of her making such a provision for her children, and in some cases she would be conscientiously and morally bound to do so; but the question remains, could she conscientioualy do it without the knowledge of her husband? Could she contract with him upon the assumption that upon its execution the property was to be his, and yet *clandestinely* place the property beyond his control? The settlement, though

a meritorious one, would not be less a fraud upon the husband; and the court interferes with it because it is done in a manner which makes it a fraud upon his marital rights. But many of the cases in *Vernon* are very inaccurately reported, and this would seem to be so in the case of *Hunt* v. *Matthews*, for in *Mr. Raithby's* edition of *Vernon* it appears, by an extract from the decree in the case, that the husband *consented* to the settlement being made by his intended wife upon her children.

In *King* v. *Cotton*, the settlement was made *before the treaty of marriage;* for the *Lord Chancellor* said, "it was a very reasonable thing for a widow, while it was in her power, to make a provision for her children by her former husband; *and this being before her treaty of marriage with Mr. King*, it had been impossible to have asked him to be a party thereto, he not being thought of."

The *master of the rolls*, in the case of *England* v. *Downs* (2 *Beav.* 527), gave no countenance to the proposition, that a settlement like that in *Hunt* v. *Matthews* would be sustained in equity, if made without the intended husband's consent. He remarks, "a woman, in such circumstances, can only reconcile all her moral duties by making a proper settlement on herself and her children *with the knowledge of her intended husband.*" The weight of American authorities is, that a settlement upon children of a former husband, if made without the knowledge of the intended husband and during the treaty of marriage, is fraudulent, and will be set aside as against him. See cases collected in 1 *Lead Ca. in Eq., H. & W.* 351.

Let us now examine the facts by which the complainant expects to maintain his case. He relies upon the answer of Daniel Carle, upon his evidence given as a witness, called by the complainant himself, and upon the admissions and conduct of Carle.

The bill charges, that Daniel Carle admitted that Sarah Carle left in the hands, or under the control of her sister, Ann Carle, the sum of seven hundred dollars, to be kept

and invested by the said Ann for the use or benefit of the children of the said Sarah, in case she should afterwards have any children; that Ann had received and invested the money, and that it, and the accumulations thereon, then amounted to fifteen hundred dollars, or more, and that he, the said Daniel Carle, had been advised, and was going to put that fund in with the other estate of the said Ann Carle, to be drawn out by and paid to whomsoever the same might legally belong.

Daniel Carle, by his answer, acknowledges that he made such admission. Take the admission without any explanation or qualification, and conceding that a decree might be made upon an admission of Carle alone, there is not enough in it to entitle the complainant to a decree. The complainant must show that the money was disposed of by Sarah Carle *during the treaty of marriage* between her and the complainant, and in a case like this, where fraud is alleged and actual fraud is the ground upon which relief is sought, a fact so essential to establish the fraud must not be left to probability or inference. The fact must be proved. This is the whole *gravamen* of the complainant's case.

In the case of *England* v. *Downs*, the witness testified that Mr. Mason told him he was about to be married, and instructed him to prepare the settlement; that he did not think it was prepared or executed with the privity or assent of *her then intended husband*. But the witness did not state who the then intended husband was. There were only two months elapsed between the date of the settlement and Mrs. Mason's marriage. The impression upon the mind of the counsel who argued against the settlement was, that the fact was sufficiently established of its being made during the treaty of marriage with the person she actually did marry, John T. Broad; and in arguing they assumed the fact to be so, so strong was the inference of that fact from the evidence. The *master of the rolls* held that the fact was not sufficiently proved of the

settlement having been made during the treaty of marriage, because, though the witness said the settlement was made without the assent of her then intended husband, some one else might have been her then intended husband other than Broad.

But here it is not charged that Carle admitted that the money was disposed of during the treaty of marriage; and his admission in his answer does not embrace that fact.

The bill, however, does charge the fact to be, that the disposition was made of the money during the treaty of marriage; and Carle was called upon to answer, as to his knowledge, information, and belief upon this subject. Carle had a right, by his answer, to explain and qualify, the admission which it was alleged he had made; and in making the discovery which the bill calls upon him to make of his knowledge, information, and belief, the defendants are entitled to the benefit of his whole answer. By his answer, he denies that he has any knowledge himself of the fact that Sarah Cole ever placed any money in the hands of her sister for the purpose named in the bill. He denies all knowledge or information of any evidence by which the fact can be established. He then states all the facts bearing upon the subject within his knowledge, and which are the facts which influenced him to make the admission which he did. He states, that before the marriage of his sister and the complainant, and while the same was in contemplation, he remembered there had been some conversation in the family of the defendant respecting the propriety of his sister Sarah's placing seven hundred dollars in the hands of her sister Ann, to be held by her in trust for any children she, the said Sarah might have by the said complainant; and also, that a few days before the death of the said Ann, she said to the defendant these words: " There is fifteen hundred dollars coming to the children." He declares that the foregoing is the only evidence he ever had that any funds

were ever placed in the hands of the said Ann in trust for the children of the complainant, and he therefore determined to treat all the property which came into his hands as the property of Ann, his intestate, unless upon representing to those interested in the estate what he supposed might be the fact, they should consent to the division of the fifteen hundred dollars among the three children of the complainant. It will be seen that here is an explanation of the alleged admission, which deprives it of the efficacy of concluding the rights of the defendants. It is a full denial of the fact, that to the knowledge or information of the defendant, his sister Sarah placed the seven hundred dollars, as alleged, in the hands of Ann Carle. The facts stated by the defendant, of the talk in his own family, and of what Ann said just before her death, do not establish that Sarah Carle, *while in treaty of marriage with the complainant, and to defraud him of his marital rights*, fraudulently placed seven hundred dollars in the hands of Ann Carle, in trust for such children as she might have by the complainant. It appears to me quite unnecessary to criticise the answer, for no court would be justified to conclude from it that it established the alleged fraud. The complainant has admitted this by filing his replication. By taking issue, he undertakes to *prove* the denial of the answer untrue. · Our next inquiry is, how far he has been successful in doing so.

He relies upon the evidence of Carle, whom he has examined as a witness, and upon the evidence of other witnesses as to the conduct and declarations of Carle.

It does not appear by what authority Carle was examined as a witness in the cause. The rule is, that where the complainant examines a defendant as a witness, he waives the right to a decree against him. There are exceptions to the rule in the cases of executors and trustees of persons who are made defendants as merely holding the fund, and who are therefore only *nominally* interested in the suit. But such is not the case with Daniel Carle.

He is not a nominal party, or made such simply as the administrator of Ann Carle. He is charged with actual fraud. The bill charges, that he advised and encouraged the disposition of the seven hundred dollars, and the concealment of the fact from the complainant. He is, besides, personally interested in the estate of his intestate, and as one of her next of kin, entitled to a distributive share of her estate. He cannot be brought within any of the exceptions to the rule. But he might be examined with the consent of all parties; and this consent is implied from the fact, that no objection was interposed before the master. His evidence was read without objection at the hearing.

What does Daniel Carle prove as a witness? Nothing more than he admits by his answer. He denies all knowledge or information as to any fact bearing upon the case, except the conversation in his own family and what Ann said a few days before her death. I have already remarked, this court cannot from these facts draw the legal inference that seven hundred dollars was fraudulently placed by Sarah Carle in the hands of her sister, Ann Carle. They do not prove the fact, that any money, for any purpose, was ever placed by Sarah in the hands of her sister Ann.

The complainant has proved the admissions and conduct of Daniel Carle. It would be strange, indeed, if any court would permit the mere admissions and conduct of an administrator to mulct the estate to the amount of debt which is sought here. Giving them their greatest weight, I do not think they amount to anything. They only prove that Daniel Carle himself *believed* that the money was placed by one sister, in the hands of the other, in trust for the complainant's children, and that acting upon that belief, he, for one, was willing and disposed to see the trust executed. But this court cannot decide the case upon the *belief* of the witness. It is not right that the defendant should be prejudiced by it. He has stated

the *facts* upon which his *belief* is founded. The court cannot tell what amount of evidence is sufficient to produce that belief in the mind of the witness. The question is, whether the *facts* stated by the witness, and not his *belief*, are sufficient to justify a decree in favor of the complainant. If they are not, the court cannot decide in his favor, no matter what may be the belief of Daniel Carle.

With this view of the case, the conduct of Carle, on which the complainant relies, can have no influence in enabling the court to reach a correct conclusion. In making his inventory, as administrator, he kept fifteen hundred dollars out of it. This only shows the bias of his own mind, and what his own belief was. He tells us why he did it, and we must now determine whether he was justified in doing so.

It was insisted that the admissions and conduct of Carle impeach his testimony, and show that he did not tell the whole truth in giving his evidence. I am at a loss to conceive how this can help the complainant. Daniel Carle was the complainant's own witness. If he was successful in impeaching his own witness, and in showing that he was not a man of veracity, and one upon whom the court can rely, what becomes of the complainant's case? The complainant has no other witness. Surely it will not be contended that if the complainant cannot recover upon the evidence of the witness upon oath, they may recover upon his contradictory statement when not under oath and by proving that he is not a credible witness.

The admissions of Carle, for the purpose of contradicting him as a witness, were not admissible as evidence. He was the complainant's own witness, and it was not competent for the party calling him to impeach him. The case presents this singular aspect, of a party relying upon the testimony of *one single witness* to prove his case, and yet endeavoring to impeach that witness by showing that his statements under oath are not entitled to credit. I do not mean to insinuate that the complainant has been at

all successful in impeaching the testimony of Daniel Carle. His evidence, it is true, does not appear well. It appears to have been very difficult to draw the truth from the witness; and by his manner of giving his testimony, he has done himself no credit. But all this should not prejudice the other defendants in the suit. If the complainant has been unable to get the truth from the witness, it is his own misfortune, and other parties in interest must not be made to suffer on that account.

I have examined the case with great care, commencing my investigation with the impression produced upon me by the argument, that the complainant was entitled to a decree. I have, however, come to the conclusion, perfectly satisfactory to myself, the complainant has not made out his case, and is not entitled to the relief he prays for.

The appeal was argued by *Vanatta* and *Whelpley*, for the appellant, and *Annin* and *Miller*, for respondent.

Points of the appellant.

1. The evidence contained in the pleadings and proofs is sufficient to establish the facts, that Sarah, the former wife of the appellant, shortly before and in contemplation of her marriage with the appellant, and without his privity, assent or knowledge, placed under the control of Ann Carle money, or choses in action, to the value or amount of seven hundred dollars, for the use of any children of the said complainant which she, the said Sarah, after her said marriage might bear.

2. The facts thus established make the trust thus created, as against the appellant, illegal and void.

3. The appellant is entitled to recover and receive for his own use the said seven hundred dollars, and the increase thereof.

4. The said Daniel Carle having, on the 13th of December, 1853, admitted to the said appellant that Sarah, the said appellant's first wife, before her marriage had

3 A*

left in the hands of her sister Ann the sum of seven hundred dollars, to be held in trust for the future children of the said Sarah, in case she should have any, and that the said seven hundred dollars at the death of the said Ann amounted to fifteen hundred dollars or over, and the said appellant having acted upon that admission by instituting his suit in the Court of Chancery for the recovery of the money so admitted to have been left with said Ann by said Sarah, the said Daniel Carle is and should be estopped from denying or attempting to disprove the fact, that the said Sarah, before her marriage with the appellant, did leave with said Ann the said sum of seven hundred dollars, and also from denying the fact, that the said Ann, at her death, still held the said seven hundred dollars, and the increments thereof, making in all over fifteen hundred dollars.

5. It being proved that the said Sarah, before her marriage with the appellant, did leave with said Ann the sum of seven hundred dollars for the use of the children of the said Sarah, and the said children having solemnly disclaimed all title to or interest in the said seven hundred dollars, and the increase thereof, the said appellant is entitled to recover and receive the same, as administrator of the said Sarah, although the said Sarah may have created the said trust, and left the said seven hundred dollars with the said Ann prior to the commencement of the treaty of marriage between the said Sarah and the said appellant.

6. It being proved that the said Sarah did at some time leave with said Ann money or choses in action, which said Ann held and retained until her death, and which at the period last mentioned amounted to over fifteen hundred dollars, if the said money or choses in action were left with said Ann at any time after the marriage between said Sarah and the said appellant, the said appellant is entitled to recover the same in this suit.

The Chief Justice delivered the opinion of the Court of Appeals.

GREEN, C. J. The case, as it stands before this court, is within very narrow limits. The Chancellor has decided, in accordance with the clear weight of authority, that if the fact is established that Sarah Carle placed the money in controversy in the hands of her sister, Ann Carle, at the time, and for the purpose alleged in the bill of complaint, the complainant is entitled to the redress which he asks. The Chancellor has further decided that the claim is not barred by the statute of limitations. The only remaining question in the case is, whether, in point of fact, the money was placed in the hands of Ann Carle by the wife of the complainant, without his knowledge, previous to their marriage, for the use of the complainant's children.

The defendant, the administrator of Ann Carle, does not deny that the money is in his hands. His conduct shows not only *his belief* that the money was held by Ann in trust for the purpose charged in the bill, but an undoubted knowledge of that fact. Soon after the death of Ann, he told one of the complainant's children that there was $1500 in his hands, which belonged to her and her brothers. He stated, in the language of the witness, " that aunt Ann said there was $1500 there for us ; money which mother left there." As administrator of Ann's estate, the defendant set aside the sum of $1500 out of the money found in her possession, as not belonging to her estate. Though advised by counsel to do so, he declined putting it into the inventory. He omitted it not by accident, but by design, from an inventory, which he exhibited under oath, as containing a true and perfect inventory of her estate. He offered to pay over the money to the children, in accordance with the terms of the trust, with the consent of the next of kin of Ann. This consent he required obviously not from any doubt of the truth of the case in his own mind, but because the knowledge of the facts rested mainly, if not exclusively, with himself. He found among the papers of Ann no written evidence of

the existence and nature of the trust, and therefore, with great propriety for his own security, he asked the assent of the persons interested in her estate to his disposal of the fund in pursuance of the trust. The next of kin of Ann, the persons interested in her estate, all gave their consent to the payment of the money to the children of Sarah, pursuant to the terms of the trust. It would have been so paid but for the objection of the complainant himself, who interposed his marital rights.

Daniel Carle was not only the administrator of Ann, but he was one of her next of kin, and entitled to a share of her estate. In excluding this fund from the estate of Ann, he acted against his own interest. He was in a position, of all others, to know the truth in regard to this fund. His sister Ann and himself were both unmarried. They lived together in the same family. He must have been cognizant, to a greater or less degree, of the extent of her property and of her business transactions. He was interested by her with the settlement of her estate. Their relations were friendly, They had no nearer or dearer ties than those which bound them to each other. Living thus as brother and sister in the same household, he was in a situation to know, and it is scarcely credible that he did not know the truth in regard to the real condition of the funds in her hands. But there is evidence that he had direct information on the subject of this trust. His knowledge of it was derived both from Sarah and Ann, the only parties to the transaction. Sarah, before her marriage, consulted him on the subject of leaving the money there, or, to use his own language, she talked to him about it. We have Sarah's declaration, that "upon her marriage, her husband and his father made so much fuss about her property, that she left it behind with her folks ;" and it is not pretended that it was left with any one but Ann. Upon her death-bed, Ann gave to the defendant, her administrator, an injunction, which he understood

related to this fund, and upon which he acted in the settle ment of her estate.

It is objected, that it is not enough that the defendant should believe the truth of the complainant's case, but the court must see that he had sufficient evidence for his belief; and that the statement he makes as a witness of what he heard from his sisters is not sufficient to warrant his belief, and therefore the court cannot act upon it. But is not this too limited a view of the testimony? Is the statement made by the defendant of what he heard from his sisters *all* the evidence in the cause upon which the court may base its action?

The examination of the defendant affords the clearest evidence that he was not a willing witness for the complainant, and that he has testified to nothing in the complainant's favor not demanded by the truth. His evidence is above all suspicion, so far as it makes in favor of the complainant's case. Without impugning at all the integrity of the witness, it is not remarkable that he should not remember distinctly, and be able to detail what passed between his sister Sarah and himself on the subject of the trust when it was created, over forty years ago. She may well have stated to him distinctly the fact, that she had placed the money in the hands of her sister Ann for a specified purpose. The conviction in his own mind resulting from the conversation may be clear, and yet he may be unable, after so great a lapse of time, to remember one word of the conversation; and he may therefore say with truth, that he does not remember what she said. Material facts, which influenced his mind, may totally have escaped his recollection. That they did so, is very clear. It is in evidence, that after the death of Ann, he informed a relative that the money which Sarah left with Ann for the children of the complainant amounted to $1500. He further stated that, in Sarah's lifetime, she sometimes came to get her interest, and sometimes Ann took it to her. This fact, upon his examination, he ap-

pears to have forgotten; but it tends strongly to show that he had not only, from the statements of his sisters, but from their acts, the most certain knowledge of the real ownership of the fund, and that it was held by Ann, as trustee. And that the interest on the fund was paid by Ann to Sarah, in her lifetime, is confirmed by the fact, that interest on the original fund of $700, from the death of Sarah to the death of Ann, would, with the principal, amount to about $1500, the sum admitted to have been in Ann's hands at her death.

In regard to the statement proved to have been made by Ann in her lifetime, that there was $1500 in her hands for the children, it is said, that the statement is equivocal, and its import so uncertain that a stranger can gather nothing from it. The more important inquiry is, what did Ann intend, and what did the defendant understand by it. It was a death-bed instruction, given by Ann to her brother, who became her administrator, touching funds in her possession. It was given three days before her death. There was ample opportunity for inquiry by the brother as to her real meaning, if there was a particle of doubt in his mind on the subject. Circumstances, already referred to, warrant the belief that he was fully acquainted with the existence and nature of the trust. And is it not manifest that he must have understood perfectly to what fund his sister referred, and of whom she spoke? If it were not so, would he not, as a brother, have inquired further respecting it? Is it credible that he entertained at that time the least doubt on the subject? And if he perfectly understood and applied the instruction given, does it at all affect the question, that the language used was general, or that its import to a stranger would have been equivocal or unintelligible? That he did perfectly understand her meaning is obvious from the fact, that he made no further inquiry on the subject; that he acted unhesitatingly and against his own interest upon his understanding of the meaning; that upon her death, he

informed the complainant's daughter that there was $1500
in his hands, left by her mother with her aunt Ann, and
that Ann said there was $1500 for herself and her bro-
thers. He kept the money out of Ann's estate. He re-
fused to administer upon it. He agreed to pay it over to
the children of Sarah, upon obtaining the consent of the
next of kin. That consent was given, and the payment of
the money prevented only by the interference of the
father of the children. And yet, in the face of all these
facts, we are asked to decide that there is no evidence
that the money was in Ann's hands, or that it belongs to
the children. We have then this extraordinary state of
things: Sarah says the money was left in Ann's hands;
Ann says the money was left in her hands for Sarah's chil-
dren. The brother, and the administrator of Ann, who
was in a position to know the whole truth, and who re-
ceived Ann's death-bed instruction on the subject, in-
forms the children that the money is in his hands. Against
his own interest, he refuses to administer upon it as a
part of Ann's estate. He makes oath that it forms no part
of her estate. He offers to pay it over to the children of
Sarah, with the consent of the next of kin of Ann. The
next of kin, at a sacrifice of their own interest, upon a
conviction of the truth, consent to the arrangement; and
yet this court is asked to decide that there is no evidence
that the fund is in existence. With great deference, it
seems to me that the evidence which entirely satisfied the
stakeholder of the money, the administrator of Ann's es-
tate, the person who of all others was in a situation to
know and must have known the truth, and induced him
to act against his own interest; the evidence which satis-
fied all the next of kin of Ann that the money did not
belong to her estate, and induced them to relinquish all
claim to it, nay the very fact of the recognition of the
trust by all the parties interested in Ann's estate, ought
to be sufficient to satisfy the conscience of a court of
equity.

The money clearly does not belong to the estate of Ann Carle; neither her administrator nor her next of kin pretend that it does. They do not claim it. To whom, then, does it belong? It is said that it belongs to the children, and that the court must protect their interests. The answer is, that the children have, by their answer to the bill, disclaimed all right and interest in the fund. Now admitting that there was no legal fraud on the marital rights of the husband, admitting that Sarah, the complainant's wife, on the eve of her marriage, rightfully placed a part of her estate in her sister's hands in trust for the children of her intended marriage, if there had been no children of the marriage, would not the fund have belonged to the husband on the death of the wife? There were children, but, as *cestui que trusts*, they disclaim title; they renounce all right to the fund, and decline to accept it. To whom, then, does it belong? Surely not to the trustee, but to the estate of Sarah, and to her husband, as her administrator. In any aspect of this case, I see no escape from the conclusion that the defendant, Daniel Carle, is a trustee, and liable for the funds in his hands to the complainant, the husband and administrator of Sarah Williams.

The complainant is entitled to recover the fund of $1500, with interest from the death of Ann Carle. But under the peculiar circumstances of the case, the defendant was fully justified in refusing to pay over the money, except under a decree or by the direction of the court. He is therefore entitled to his costs. The defendant should be permitted to deduct from the amount of the fund and interest his taxed costs of defence, both in the Court of Chancery and in this court.

The decree of the Chancellor must be reversed, and the proceedings remitted to the Court of Chancery, that the case may be proceeded in accordingly.

The following dissenting opinions were read

POTTS, J.   The complainant, who is the administrator of his deceased wife, Sarah, filed his bill in this case against Daniel Carle, who is the administrator of Ann Carle, deceased, and the three children of Ebenezer and Sarah Williams, alleging that while his courtship or treaty of marriage with the said Sarah was pending, she, the said Sarah, left in the hands, or under the control of her sister, Ann Carle, the sum of $700, to be kept and invested by the said Ann, for the use or benefit of the children of the said Sarah, in case she should afterwards have any children; that the same had been so invested, and with its acmulation amounted to $1500, or more.   The bill further alleges, that the marriage between the complainant and said Sarah took place March 17th 1819; that said Sarah died on the 19th of November, 1834; that, in 1837, he married her sister, who is still living; that Ann Carle died intestate, about the 25th of September, 1852, never having been married; and that, on the 13th December, 1853, he was informed for the first time, by Daniel Carle, of this deposit having been made with Ann Carle, thirty-five years before, for the purposes aforesaid.   He insists that this was in fraud of his martial rights, and prays that the trust may be set aside, and the money paid over to him, with all the interest which has accrued since the deposit was made.

Ann Carle, as has been stated, died in 1852.   She left, as appears, in personal estate nearly $10,000, chiefly invested in bonds and notes.   She made no disposition of any of her property, and left behind her no written evidence of any kind that she had any such trust fund in her hands as is mentioned in the bill.   Her next of kin are Daniel, and Lydia, the present wife of Williams, and the children of Elizabeth and those of Sarah, her two deceased sisters.

The complainant then sets up a claim to have paid to him out of the estate of Ann Carle, deceased, the sum of $700, with the interest thereon, from the time of the

alleged deposit, that is from the year 1818, up to the time
of said Ann's death, amounting, as he says, to considerably
over $2000 ; and to establish his right he is bound, in the
first place, to prove the allegation upon which it is founded,
to wit, that his former wife actually deposited with Ann,
or left with her before the marriage, the said sum of
money.

The only important evidence in support of this allega-
tion is to be found in the answer and declarations of Daniel
Carle.

The bill sets out the information given to the complain-
ant by Carle, in 1853, and calls upon Carle to answer under
oath as to the truth of this information given, and his knowl-
edge of the fact. Daniel answers, that he *does not himself
know that any such sum, or any other sum, was ever placed
in the hands of the said Ann by the said Sarah, previous
to her marriage with the complainant ;* that he never,
in any way or manner, counselled or advised any invest-
ment or concealment of any such funds. He admits that
on a certain occasion, at his own house and in the pre-
sence of the complainant, his wife and children, and
several others, Mr. Annin, his attorney, by his authority
and at his request, stated that Sarah, the complainant's first
wife, before her marriage, had left in the hands of her
sister Ann, the sum of $700, to be held in trust for the
future children of the said Sarah, in case she should have
any, and that said money amounted, at Ann's death, to
$1500, or over ; but that as no evidence of the fact was to
be found among the papers of said Ann, he, as her adminis-
trator, intended to put the same in with said Ann's estate,
*unless by the consent of those interested in the estate, he was
allowed to pay it over to the children.* He gives his reasons
for having made this statement by his attorney. He says,
that before the marriage of Sarah with the complainant,
and while the same was in contemplation, he remembered
*there had been some conversation in his family* respecting
the *propriety* of said Sarah's placing $700 in the hands

of her sister Ann, to be held in trust, &c. ; and that a few days before the death of said Ann, she said to him, " *there is* $1500, *or over, coming to the children*." That the foregoing is the *only evidence he ever had* that any such funds were so placed in Ann's hands, and that *he never knew that any arrangement of the kind proposed was ever carried into effect.*

The defendant was subsequently called as a witness by the complainant, and testified, in relation to the conversation in the family before the marriage, that *Sarah talked to him about the matter*, but he did not know whether Ann was present or not ; that Ann's remark, above stated, was made to him in her last sickness, *two or three days before her death ;* that she was in bed ; that he don't remember anything more being said ; that she was so far gone he did not want to trouble her with any inquiries.

Upon the question, whether the $700 was actually left by Sarah in Ann Carle's hands, *this is the whole evidence.* In the course of a long examination of Daniel Carle, nothing more is elicited as to his *knowledge* of the matters stated in his answer. *Ann Vail* is called. She says *Daniel* told her what he authorized his attorney to tell the complainant. She states, indeed, something her aunt Sarah (Mrs. Williams) told her, but this is not evidence in support of her husband's claim. *Sarah Williams* is called, and testifies that *Daniel* told her what he told Ann Vail. But the defendant, in his answer, swears that if he said so to anybody, it was for the reasons he had before stated. *Daniel C. Williams* and *William M. Clark* are called, and testify to what passed at the meeting when Mr. Annin made the statement mentioned in the answer, but without varying it in substance. This testimony therefore leaves the case *precisely where it stood upon the answer.*

Then the evidence as to the fact of the deposit of this money with Ann Carle consists—1. Of the conversation in the family of Daniel previous to Sarah's marriage. And all that we know of that is, that there *had been* a conversation about the *propriety* of such a measure ; that *Sarah*

had spoken to the *defendant* about it. He swears that he does not know that any money was *ever* paid to Ann or left with her; saw nothing of the kind; heard nothing of the kind. Standing alone, this amounts to positively *nothing*. It is only by coupling it with the death-bed declaration of Ann, thirty-four or five years after, that it becomes of any importance at all. That declaration was, " there is $1500, or over, coming to the children," made on a sick bed by a sick woman, two or three days before her death to Daniel Carle alone, *without one further word of explanation*. How coming? coming from whom? coming to the children? what children? Does she say Sarah had deposited money with her for her children? She does not. Does she say there is $1500 coming to Sarah's children out of my estate? She does not. Does she say this money is coming to Sarah's children at all? She does not. And yet upon the case as made, it is affirmed that she is now, for the first time in her life, disclosing the important fact of the *creation of a trust* in favor of these children which had been locked up in her *own bosom* for eighteen years, the period that had elapsed since her sister's death; a secret trust created thirty-four years before, and as far as appears, *never known* to anybody but Ann and Sarah herself—never revealed by either during that time, not even to the *cestui que trusts* themselves.

It is true that Ann Vail says *Daniel Carle* told her, in 1853, that Sarah, sometimes, in her lifetime, came and got the interest, and when she did not, Ann went and took it to her. Daniel is not asked about this. But the complainant states, in his bill, that for twelve or fourteen years after their marriage, he left a considerable portion of her funds under *her own control*, and that it was not until he purchased a farm, that he called upon her for her funds, and that she then gave up to him, *as he then understood and supposed*, and always supposed until five months before he filed his bill, all the funds which she owned at the time of the courtship and marriage, with all the inter-

est which had accrued ; but it is quite as probable that she may have without his knowledge received some portion of the accruing interest upon these funds, and concealed that fact from him, as that she kept back and concealed a por tion of the principal.

I do not say that in this answer and evidence, taken together, there is not enough to raise a *probability* that the money claimed was in fact left by Sarah in Ann's hands, as charged in the bill. I think there is. But my difficulty is, that there is no *positive proof*, nor anything that amounts to *conclusive* evidence of the fact. The burthen of proof was on the complainant in the court below. The Chancellor held, that for the want of such proof, he had failed to support his bill. The appellant here is bound to satisfy us that in this the Chancellor erred, and he has not done so to my satisfaction.

The counsel of the appellant lays great stress upon the fact, that Daniel Carle *believed* the money had been deposited, as charged ; that he was *willing,* if the other heirs *consented,* to pay over the money to the children ; and that he kept it out of the inventory. But whatever Daniel Carle, or any other heirs of Ann Carle *believed,* or may have been willing to *do* in reference to the children, and whatever their motive or the influence which induced them may have been to express such consent, we are not at liberty to *believe* because *they believed ;* and as far as they are before the court, they are here *resisting* the complainant's claim, and asking such protection as the facts *would* in the case entitle them to.

Undoubtedly, in the absence of positive proof, we may look to the *circumstances* of the case for additional light ; and if these are sufficiently strong to satisfy the judgment, we may take the case as proved. But what are the circumstances here ?

The allegation is, that $700 was deposited with Ann Carle by Sarah, in 1818 or 19, in trust, &c. Ann died thirty-five years afterwards, and not a scrap of paper is

3 B*

found in reference to such deposit, neither among the papers of the alleged trustee nor in the possession of anybody else. It is alleged, that during Sarah's lifetime, a period of sixteen years, she paid Sarah the interest upon this fund, but no receipt for a dollar of interest is found. According to the alleged terms of the trust, after the death of Sarah, the money belonged to the children of Ebenezer Williams. Sarah died in 1834; Ann lived until 1852, a period of eighteen years after this; at her death, the children were all of age; Sarah was 26, Theodore 28, and Daniel C. 32; yet Ann, it is clear, not only never paid to either of them a single dollar, but never so much as informed them, or either of them, that she had this money in her hands. The case does not show that any one, except Sarah and Ann, knew anything of this deposit being made, and the fact, if it existed, was kept a profound secret by these two women during their whole lives; for all that Ann Vail says Sarah told her was, that "they (her husband and his family) made such a fuss about the property, right away as soon as she was married, that she meant they should never know what she had, or how much she had." For conduct so extraordinary, we ought to be able to see some motive. Ann Carle must have been acquainted with business, for she acted as her brother's executrix. Daniel Carle, the brother, seems always to have had the confidence of both sisters. To some extent, at least, he managed their finances, and it seems strange, to say the least, that not a scrap of written evidence should have been left, not a witness produced to prove the fact, that even the brother never should have been made a confident of the fact of the deposit and the terms of the trust, nor either of the *cestui qui trusts;* and that knowing, as Ann must have known, if the fact was as stated in her last sickness, that she was the sole remaining depositary of the secret, she should not have disclosed to him, or to some one, in explicit terms the fact, instead of using language which might easily have been

misunderstood and misinterpreted, and the meaning of which is undoubtedly ambiguous.

The complainant below made, I think, a doubtful case, and these circumstances increase the doubt. They show a state of things, it seems to me, inconsistent with what experience teaches us to expect in human conduct.

It has been asked by the complainant's counsel, if Ann Carle, in saying on her death-bed, "there is $1500, or over, coming to the children," did not mean there was that sum of trust money coming to the children of Ebenezer Williams out of her estate, *what did she mean.* The question was well put. But it was a question for the complainant, and not for the defendant, to answer, and to answer so as to satisfy the conscience of the court. I think he has not done so. I am, for one, in doubt what she meant. I am in doubt, for the very reason that her language does not inform me. I may conjecture : I may think the probabilities are in favor of the construction the complainant puts on her words ; but I am unwilling to decide a question of property—to take money from one party and give it to another—on conjectures and probabilities. The complainant claims this money as a creditor of Ann Carle's estate. He has not, in my judgment, proved his claim, and I feel unwilling to enforce a claim which is not proved. I may add, that if the complainant is entitled to recover at all, I do not see why he is not entitled to the $700 and thirty-four years' interest upon it. This is his claim. There is no legal evidence before the court of the payment of interest on this $700 during Sarah's life. Ann Carle's saying the sum was $1500, or over, and *Ann Vail's* testifying that Daniel told her that Sarah sometimes came and got the interest, and when she didn't, Ann went and took it to her, surely is not evidence by which the liability of the estate can be discharged from the payment of interest on this $700. These witnesses are all testifying in favor of their own interest.

I am of opinion, on the whole, that the decree should be affirmed.

ELMER, J.   It is clear that the appellant is entitled to no relief, unless there is satisfactory evidence, from the admissions of Daniel Carle or otherwise, that Ann Carle had in her hands, at the time of her death, a sum of money, which at some time belonged to her sister Sarah Williams, the appellant's wife.   The declarations or acts of Sarah are not competent evidence of this fact; although such declarations or acts might be evidence of the fraud upon the marital rights of her husband, if it was otherwise established that Ann Carle was the depositary of the money.

A few days before her death, Ann Carle said to her brother Daniel, who has since administered on her estate, these words : " there is fifteen hundred dollars, or over, coming to the children." She said nothing, and referred to nothing from which it could be ascertained what children she meant.   There is no proof that she ever, in any way, acknowledged that she had received any money or other property from or for her sister Sarah, or that there was any money in her hands belonging to her or her children.

It appears that when Daniel Carle came to make an inventory of Ann's estate, as her administrator, he omitted to include therein fifteen hundred dollars of her assets, and there can be no doubt, I think, that he did so because he believed that the fifteen hundred dollars spoken of by Ann, as coming to the children, was money in her hands arising from funds left with her by Sarah Williams, for the use of her children.   But are the facts, that he entertained this belief, and so acted, sufficient to justify the court in decreeing this money to belong either to the husband or children of the said Sarah, and thus take it from the next of kin of Ann.   In my opinion, they are not.   Not only has Daniel Carle been called on to answer

the complainant's bill under oath, but he has been examined as his witness, and he states that he never heard Ann Car.e say that she had received any money from her sister, or that she had any in her hands belonging to her or her children, and that he did not know, from any com-munication of hers, what she meant by the words she spoke, as before mentioned. He states that he had heard, in the family, that Sarah proposed to place seven hun-dred dollars in the hands of her sister Ann, to be held by her in trust for any children Sarah might have, and that Sarah told him so herself. It is also proved, by Ann Vail, that Daniel Carle told her that some money her aunt Sally Williams had left, amounted to fifteen hundred dollars, and that she came there (meaning evidently his house, where Ann lived), and got the interest, and when she did not, Ann went and took it herself. These circumstances account for Daniel Carle's belief and his conduct. But as the complainant's witness, he expressly testifies that he knew nothing about the matter from Ann herself, nor is there any proof from any other witness that he did. It must therefore be assumed that his belief, as to what Ann meant, was derived wholly from information received from other persons, so that we have no evidence before us, but the fact that such information was given to him, and that he believed it.

It was insisted, for the appellant, that it is a sufficient ground for the court to act upon in this case that the de-fendant sought to be charged believes the fact to be so. The rule is, that the unqualified admission of the defendant that he believes a fact charged to be true, is generally suffi-cient to entitle the complainant to a decree. 3 *Greenl. Eve.* § 282. But the defendant makes no such admission. What the defendant believes, the court will also ordinarily believe. But this maxim has no application to a case where the defendant is called as a witness, and states the ground of his belief. Had the testimony of Ann Vail and the other testimony in regard to the declarations and acts

of Daniel Carle, as administrator, been before the court without any explanation of the causes that produced them, perhaps we might very fairly have inferred that those declarations and acts were founded on knowledge derived from Ann Carle herself, whom he now represents. But having been himself made a witness for the complainant, we are bound to look at the reasons for his conduct, or, in other words, to take his statements all together.    It thus appears that his belief and conduct were founded, not upon the acts or admissions of Ann Carle, but wholly upon information derived from others, whose statements to him would not be competent evidence to affect the interest of Ann Carle or of her next of kin. The stream can rise no higher that its source.    And if it be admitted to be true, as was so earnestly insisted on the argument, that this court cannot help believing as Daniel Carle and the other interested persons believed, the answer is, we have no right to act judicially upon a belief produced by the declarations or acts of persons which are not competent by the well established rules of law to be proved in evidence.    The jury and the judge may often put implicit confidence in the mere statement of one of the parties, but they must have legal proof before they can act.

On the thirteenth day of December, 1853, it appears that a sale took place of Ann Carle's goods and chattels, when the appellant, the three children of Sarah Williams, who were all of age, and most, but not all of the next of kin of Ann, were present.    Mr. Annin, as the counsel of the administrator, and at his request, stated to them, that thirty-five years before, Sarah Williams had left seven hundred dollars in the hands of her sister Ann, to be kept for her children, and that the fund amounted to fifteen hundred dollars, or more, and that this money would be put into the estate of Ann, unless by the consent of those interested in her estate, he was allowed to pay over five hundred dollars to each of the children of Sarah

Williams. Most, or perhaps all of those present, except the appellant himself, whose present wife is one of Ann's next of kin, appear to have assented to this; but nothing was done to render the consent of any of them binding. Subsequently the appellant claimed all the money as belonging rightfully to him, and the administrator declined paying him without a suit. Had all the persons interested in the estate been present at the sale, and expressed their full belief that the representation made was true, and consented to the payment of the money to the children, as proposed, their doing so would not have bound them in this suit. But those who were present, at the most, did not contradict the representation made as to the facts, and assented to the money being paid to the children, who it seems afterwards disclaimed any right to it. None of them agreed that the appellant should have it. Daniel Carle, in one part of his testimony, says that those interested in Ann Carle's estate consented to the payment of five hundred dollars to each of the children; but it is plain that he refers to what took place on the day of the sale, and that he means all who were there. It was urged that the next of kin do not now claim this money. They are, however, no parties to this suit, and have never relinquished their right.

It was also insisted that Daniel Carle's admissions bind him, and are sufficient to entitle the appellant to a decree upon the ground that he is defending this suit in his own right, the money in dispute never having been put into the estate. But this is certainly not so. He is accountable for this fund, as part of the assets of Ann Carle in his hands, just as truly as if he had included it in the inventory : and any decree made against him must be against him as administrator, and upon the principles, as to costs and otherwise, usual in such cases. The contest for this money is in truth between the appellant and the next of kin of Ann Carle, who are entitled to the protection of

the court.    I am of the opinion that the decree ought to be affirmed.

Decision reversed by the following vote:

*For affirmance*—Judges ELMER, POTTS, RISLEY, VREDEN-BURGH, WILLS.

*For reversal*—CHIEF JUSTICE, Judges HAINES, HUYLER, ARROWSMITH, CORNELISON, RYERSON, VALENTINE.

CITED *in Stevens Ex'trx. v. Stevens Exrs.* 9 *C. E. Gr.* 87, 578; *Baldwin v. Van Vorst,* 2 *Stock.* 577.